Hilgers Graben PLLC
Michael Merriman, California Bar No. 234993
mmerriman@hilgersgraben.com
655 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 369-6232
Attorney for PLAINTIFF ISHA FATHMATH
AND THE PROPOSED CLASS

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISHA FATHMATH, on behalf of herself and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br><br>ESSILORLUXOTTICA S.A., *et al.*,<br><br>Defendants. | Case No. 3:23-cv-3626<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1, ET SEQ.;**<br><br>**THE CALIFORNIA CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16720, ET SEQ.; AND**<br><br>**THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, ET SEQ.**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Isha Fathmath ("Plaintiff"), on behalf of herself and all others similarly situated, brings this action against Defendants EssilorLuxottica S.A., Luxottica Group, S.p.A., Essilor International SAS, GrandVision BV, EssilorLuxottica USA Inc., Luxottica U.S. Holdings Corp., Essilor of America Holding Company, Inc., Luxottica of America, Inc., and Essilor of America Inc.

(together, "EssilorLuxottica")[1], Frames for America, Inc., For Eyes Optical Company, Inc., Costa Del Mar, Inc., Oakley, Inc., EyeMed Vision Care, LLC ("EyeMed"), Vision Source, LLC ("Vision Source"), and BBGI US, Inc., Brunello Cucinelli S.p.A., Brunello Cucinelli, USA, Inc., Bulgari S.p.A., Bulgari Corporation of America, Burberry Group plc, Burberry Limited, Chanel Ltd, Chanel, Inc., Dolce & Gabbana S.r.l., Dolce & Gabbana USA Inc., Ferrari S.p.A., Gianni Versace S.r.l., Versace USA, Inc., Giorgio Armani S.p.A., Giorgio Armani Corporation, Michael Kors (USA), Inc., Prada S.p.A., Prada USA Corporation, Ralph Lauren Corporation, Tapestry, Inc., Tiffany & Co., and Tory Burch LLC (together, "Fashion Houses"), and Kering S.A., Kering Eyewear S.p.A., Kering Eyewear USA, Inc., LVMH Moët Hennessy Louis Vuitton SE, LVMH Moët Hennessy Louis Vuitton Inc., Christian Dior SE, Christian Dior, Inc., Marcolin S.p.A., Marcolin U.S.A. Eyewear Corp., Thélios S.p.A., and Thelios USA Inc. (together, "Competing Eyewear Entities") (all collectively, "Defendants").  Plaintiff, on behalf of herself and similarly situated persons, demands a trial by jury on all counts for which a right to trial by jury is allowed and, in support of this Complaint, alleges as follows:

## NATURE OF THE ACTION

1.      This class action for damages and equitable relief arises out of EssilorLuxottica and other Defendants' anticompetitive and unfair business practices in the non-contact-lens consumer eyewear market.  Defendants have entered into unlawful agreements to fix the price of consumer eyewear at supra-competitive rates in violation of § 1 of the Sherman Antitrust Act, § 16720 of the Cartwright Act, and the California Unfair Competition Law.

2.      EssilorLuxottica is the world's largest conglomerate in the eyewear industry, controlling by some estimates as much as 80 percent of the global eyewear market.[2]  Through decades of acquisitions, licensing agreements, and sales agreements, EssilorLuxottica has positioned itself as a vertically integrated, multinational behemoth, which designs, manufactures,

---

[1] *See* Appendix, *infra* ¶¶ 167–175, for a reference list of collective terms defined throughout the Complaint.

[2] Ana Swanson, "Meet the Four-Eyed, Eight-Tentacled Monopoly That is Making Your Glasses So Expensive," FORBES.COM (Sept. 10, 2014), available at https://www.forbes.com/sites/anaswanson/2014/09/10/meet-the-four-eyed-eight-tentacled-monopoly-that-is-making-your-glasses-so-expensive/?sh=6af967dd6b66.

distributes, and/or sells over thirty of the most popular consumer eyewear brands in the United States.  Additionally, through EyeMed, owned chain retail outlets, and affiliated eyecare providers, EssilorLuxottica is among the largest players in both the vision benefits and eyecare industries, exercising control over more than 80 percent of American optometrists.[3]

3.      EssilorLuxottica is the instigator and primary enforcer of a national price-fixing scheme in the consumer eyewear market with Defendants Frames for America, Inc., For Eyes Optical Company, Inc., Costa Del Mar, Inc., Oakley, Inc, the Fashion Houses, the Competing Eyewear Entities, and other entities.  EssilorLuxottica has formed exclusive licensing agreements and sales agreements with its horizontal competitors in the consumer eyewear market to manipulate and artificially inflate the price of eyewear by as much as 1000 percent for Defendants' collective financial benefit.  To further this price-fixing scheme, EssilorLuxottica, through its vision benefits subsidiary EyeMed, has also formed anticompetitive agreements with thousands of American eyecare providers to unfairly channel millions of consumers into purchasing the conglomerate's over-priced eyewear.

4.      Defendants' anticompetitive and unfair business practices violate the Sherman Antitrust Act, the Cartwright Act, and the California Unfair Competition Law.  Plaintiff and millions of other consumers have suffered losses as a direct and proximate result of Defendants' unlawful conduct and are entitled to relief including but not limited to actual damages, treble damages, equitable relief, and reasonable costs and attorneys' fees.

## **VENUE AND JURISDICTION**

5.      Plaintiff's claims arise under § 1 of the Sherman Antitrust Act, codified at 15 U.S.C. § 1 (and under § 3 for residents of the District of Columbia and U.S. Territories); under § 16720, et seq., of the Cal. Bus. & Prof. Code; and under § 17200, et seq., of the Cal. Bus. & Prof. Code. Plaintiff seeks damages under these statutes and under § 4 of the Clayton Act, codified at 15 U.S.C. § 15, as well as injunctive relief under § 16 of the Clayton Act codified at 15 U.S.C. § 26.

---

[3] David Balto, "Get ready to pay when one company dominates the eyeglass market," THE HILL (Nov. 28, 2017), https://thehill.com/opinion/healthcare/362146-get-ready-to-pay-when-one-company-dominates-the-eyeglass-market/.

6.      This Court has subject-matter jurisdiction over Plaintiff's claims under 15 U.S.C. § 15 (in that they arise from injuries Plaintiff suffered by reason of conduct forbidden in the antitrust laws); 28 U.S.C. § 1331 (in that they arise under the laws of the United States); and 28 U.S.C. § 1337(a) (in that they arise under an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies).  This Court has supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367(a).

7.      This Court has personal jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) transacted business throughout the United States, including in this District; (b) sold eyewear throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) were engaged in an unlawful restraint of trade which injured persons residing in, located in, or doing business through the United States, including in this District.

8.      Defendants engaged in conduct inside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.  The activities of Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

9.      Venue is proper in this District pursuant to § 12 of the Clayton Act, codified at 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)–(d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, has agents in, or is found to transact business in, this District.

## PARTIES

10.      Plaintiff is an individual domiciled in San Francisco, California.  Plaintiff purchased a pair of Ray-Ban sunglasses at a Sunglass Hut in San Francisco, California, on January 26th, 2022. Plaintiff brings this action on behalf of herself and all consumers in the United States who have purchased non-contact-lens eyewear from Defendants ("Class Members").

11.     Defendant EssilorLuxottica S.A. is upon information and belief a joint stock company incorporated under the laws of France, with a registered office at 147 rue de Paris 94220, Charenton-Le-Pont, France.  EssilorLuxottica S.A. was formed from the 2018 merger of Luxottica Group S.p.A. and Essilor International SAS.  Upon information and belief, EssilorLuxottica S.A. owns Defendant GrandVision BV.

12.     Defendant Luxottica Group S.p.A. is a corporation organized under the laws of Italy with its principal place of business at Piazzale Luigi Cadorna 3, 20121 Milan, Italy, and an office in the United States at 4000 Luxottica Place, Mason, Ohio 45040.  Upon information and belief, Luxottica Group S.p.A. owns Defendant Luxottica U.S. Holdings Corp and online retailer Glasses.com.  Luxottica Group S.p.A. also owns Defendant Oakley, Inc., and Alain Mikli, Arnette, Oliver Peoples, Persol, Ray-Ban, Sferoflex, Starck Biotech Paris, and Vogue Eyewear (together with Defendant Costa Del Mar, Inc., "Proprietary Brands"), and holds exclusive licenses for the eyewear brands of the Defendant Fashion Houses.  To the extent that several of the Fashion Houses have renewed their licensing agreements since the merger of Luxottica Group S.p.A. and Essilor International SAS, EssilorLuxottica S.A. may hold these licensing agreements directly.

13.     Defendant Essilor International SAS is upon information and belief a French simplified joint-stock company with its principal place of business at 147 rue de Paris 94220, Charenton-le-Pont, France.   Upon information and belief, Essilor International SAS owns Defendants Essilor of America Holding Company, Inc. and Costa Del Mar, Inc.

14.     Defendant GrandVision BV is a Dutch corporation with its principal place of business at Tower C, 6th floor, Evert van de Beekstraat 1-80, 1118 CL Schiphol, Netherlands. Upon information and belief, GrandVision BV owns Defendant For Eyes Optical Company, Inc.

15.     Defendant EssilorLuxottica USA Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801.  Upon information and belief, EssilorLuxottica USA Inc. is a holding company for EssilorLuxottica S.A.'s North American business activities.

16.     Defendant Luxottica U.S. Holdings Corp. is a Delaware corporation with its principal place of business at 44 Harbor Park Drive, Port Washington, New York 11050.  Upon information and belief, Luxottica U.S. Holdings Corp. owns Defendant Luxottica of America, Inc.

17.     Defendant Essilor of America Holding Company, Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801.  Upon information and belief, Essilor of America Holding Company, Inc. owns Defendant Essilor of America Inc.

18.     Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040.  Upon information and belief, Luxottica of America, Inc. owns eyewear retailers LensCrafters, Pearle Vision, Target Optical, Sunglass Hut (together with Oakley retail stores, Ray-Ban retail stores, Glasses.com, FramesDirect.com, and For Eyes, "Retail Outlets"), and Defendant EyeMed Vision Care, LLC.

19.     Defendant Essilor of America Inc. is a Delaware corporation with its principal place of business at 13555 N. Stemmons Fwy, Dallas, Texas 75234.  Upon information and belief, Essilor of America Inc. owns Defendants Vision Source and Frames for America, Inc.

20.     Defendant Frames for America, Inc. is a Texas corporation with its principal place of business at 2801 S. Interstate 35, Suite 170 in Austin, Texas 78741.  Upon information and belief, Frames for America, Inc. is an online eyewear retailer that sells eyewear under the service marks FramesDirect and FramesDirect.com.

21.     Defendant For Eyes Optical Company, Inc. is a Florida corporation with its principal place of business at 285 West 74th Place, Hialeah, Florida 33014.  Upon information and belief, For Eyes Optical Company, Inc. is an online eyewear retailer that sells eyewear under the service mark For Eyes.

22.     Defendant Costa Del Mar, Inc. is a Florida corporation with its principal place of business at 2361 Mason Avenue, Suite 100, Daytona Beach, Florida 32117.

23.     Defendant Oakley, Inc. is a Washington corporation with its principal place of business at One Icon, Foothill Ranch, California 92610.

24.     Defendant EyeMed is a company formed under the laws of Delaware with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040 United States.

25.     Defendant Vision Source is a company formed under the laws of Texas with its principal place of business at 23824 Highway 59 N, Kingwood, Texas 77339.

26.     Defendant BBGI US, Inc. (f/k/a Brooks Brothers Group, Inc.) is a Delaware corporation with its principal place of business at 100 Phoenix Avenue, Enfield, Connecticut 06082.

27.     Defendant Brunello Cucinelli S.p.A. is a corporation organized under the laws of Italy with a registered office at Viale Parco Dell'Industria, 5, Solomeo, Corciano, 06073.

28.     Defendant Brunello Cucinelli, USA, Inc. is a New York corporation with its principal place of business at 466 Saw Mill River Road Ardsley, New York 10502.   Upon information and belief, Brunello Cucinelli S.p.A. owns Defendant Brunello Cucinelli, USA, Inc.

29.     Defendant Bulgari S.p.A. is an Italian corporation with a registered office at Lungotevere Marzio11, 00186 Rome, Italy.   Upon information and belief, Bulgari S.p.A. owns Defendant Bulgari Corporation of America.

30.     Defendant Bulgari Corporation of America is a New York corporation with its principal place of business at 555 Madison Avenue, 9th Floor, New York, New York 10022.

31.     Defendant Burberry Group plc is a company formed under the laws of the United Kingdom with its principal place of business at Horseferry House, Horseferry Road, Westminster, London, SW1P 2AW, United Kingdom.   Upon information and belief, Burberry Group plc owns Defendant Burberry Limited.

32.     Defendant Burberry Limited is a New York corporation with its principal place of business at 444 Madison Avenue, New York, New York 10022.

33.     Defendant Chanel Ltd is a British corporation with its principal place of business at 5 Barlow Place, Westminster, London, W1J 6DG, United Kingdom.   Upon information and belief, Chanel Ltd owns Defendant Chanel, Inc.

34.     Defendant Chanel, Inc. is a New York corporation with its principal place of business at 9 W 57th St, 44th Floor, New York, New York 10019.

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**
*Fathmath v. EssilorLuxottica S.A., et al.*, United States District Court Northern District of California

35.     Defendant Dolce & Gabbana S.r.l. is a company formed under the laws of Italy with a registered office at Via Carlo Goldoni 10, 20129 Milan, Italy.  Upon information and belief, Dolce & Gobbana S.r.l. owns Defendant Dolce & Gabbana USA Inc.

36.     Defendant Dolce & Gabbana USA Inc. is a Delaware corporation with its principal place of business at 546 5th Ave, New York City, New York 10036.

37.     Defendant Ferrari S.p.A. is an Italian corporation with a registered office at Via Emilia Est 1163, 41122 Modena MO, Italy.

38.     Defendant Gianni Versace S.r.l. is a company formed under the laws of Italy with a registered office at Piazza Luigi Einaudi 4, 20124 Milan, Italy.  Upon information and belief, Gianni Versace S.r.l. owns Defendant Versace USA, Inc.

39.     Defendant Versace USA, Inc. is a New York corporation with its principal place of business at 11 West 42nd Street, 28th Floor, New York, New York 10036.

40.     Defendant Giorgio Armani S.p.A. is an Italian corporation with a registered office at Via Ambrogio Bergognone 38, 20144 Milan, Italy.  Upon information and belief, Giorgio Armani S.p.A. owns Defendant Giorgio Armani Corporation.

41.     Defendant Giorgio Armani Corporation is a New York corporation with its principal place of business at 335 Madison Ave, 28th Floor, New York, New York 10017.

42.     Defendant Michael Kors (USA), Inc. is a New York corporation with its principal place of business at 11 West 42nd Street, New York, New York 10036.

43.     Defendant Prada S.p.A. is an Italian corporation with a registered office at Via Antonio Fogazzaro 28, 20135 Milano, Italy.  Upon information and belief, Prada S.p.A. owns Defendant Prada USA Corporation.

44.     Defendant Prada USA Corporation is a Delaware corporation with its principal place of business at 610 W. 52nd Street, New York, New York 10019.

45.     Defendant Ralph Lauren Corporation is a Delaware corporation with its principal place of business at 650 Madison Avenue, New York, New York 10022.

46.     Defendant Tapestry, Inc. is a Maryland corporation with its principal place of business at 10 Hudson Yards, New York, New York 10001.  Upon information and belief, Tapestry, Inc. owns the brand Coach.

47.     Defendant Tiffany & Co. is a Delaware corporation with its principal place of business at 727 Fifth Avenue, New York, New York 10022.

48.     Defendant Tory Burch LLC is a company formed under the laws of Delaware with its principal place of business at 11 W 19th St, New York, New York 10011.

49.     Defendant Kering S.A. is a French company with headquarters at 40, rue de Sèvres, 75007 Paris, France.  Upon information and belief, Kering S.A. owns Defendant Kering Eyewear S.p.A. and fashion houses Balenciaga, Chloe, Gucci, Maui Jim, and Saint Laurent.

50.     Defendant Kering Eyewear S.p.A. is an Italian corporation with a registered office at Via Altichiero 180, 35100 Padova, Italy.  Upon information and belief, Kering Eyewear, S.p.A. was created in 2016 as a spin-off company of Kering S.A. solely to design and distribute eyewear products for Defendant Kering S.A.'s brands, and owns Defendant Kering Eyewear USA, Inc.

51.     Defendant Kering Eyewear USA, Inc. is a Delaware corporation with its principal place of business at 200 Somerset Corp Blvd, Suite 4002, Bridgewater, New Jersey 08807.

52.     Defendant  LVMH Moët Hennessy Louis Vuitton SE ("LVMH") is a French company with a registered office at 22 Avenue Montaigne, 75008 Paris, France.  Upon information and belief, LVMH owns Defendants LVMH Moët Hennessy Louis Vuitton Inc., Bulgari S.p.A., Tiffany & Co., and Thélios S.p.A.

53.     Defendant LVMH Moët Hennessy Louis Vuitton Inc. is a Delaware corporation with its principal place of business at 19 East 57th Street, New York, New York 10022.

54.     Defendant Christian Dior SE is a company formed under the laws of France with a registered office at 30 Avenue Montaigne, 75008 Paris, France.  Upon information and belief, Christian Dior SE owns Defendant Christian Dior, Inc.

55.     Defendant Christian Dior, Inc. is a New York corporation with its principal place of business at 19 East 57th Street, New York, New York 10022.

56.     Defendant Marcolin, S.p.A. is upon information and belief an Italian corporation with a registered office at Zona Industriale Villanova 4, 32013 Villanova BL, Italy.

57.     Defendant Marcolin U.S.A. Eyewear Corp. is upon information and belief a New Jersey Corporation with its principal place of business at 3140 US-22, Somerville, New Jersey 08876.

58.     Defendant Thélios S.p.A. is upon information and belief an Italian corporation with its principal office at Zona Industriale Villanova 16, 32013 Villanova BL, Italy.  Thélios S.p.A. was created in 2017 "when LVMH entered the eyewear industry by joining forces with sector expert Marcolin [Marcolin, S.p.A]."[4]  Upon information and belief, Thélios S.p.A. owns Defendant Thelios USA Inc.

59.     Defendant Thelios USA Inc. is a Delaware corporation with its principal place of business at 201 RT-17N, Suite 805, Rutherford, New Jersey 07070.

60.     All conditions precedent to the bringing of this action have occurred, or Defendants have waived them.

## THE RELEVANT MARKET FOR CONSUMER EYEWEAR

61.     This case concerns one antitrust product market: the market for non-contact-lens consumer eyewear.  This market may be divided into sub-markets for prescription eyeglasses (including prescription sunglasses) and non-prescription sunglasses.  This market does not include contact lenses.  The geographic scope of this market is nationwide.  Each Defendant is involved in the consumer eyewear market across the United States, including in California.

62.     The American consumer eyewear market was estimated to generate over $24 billion in revenue in 2022.[5]  Of this, the sunglasses sub-market accounted for over $4 billion.[6]

63.     The market for consumer eyewear has a number of characteristics that distinguish it from the contact lens market.  For one, consumer eyewear manufacturers and retailers look

---

[4]     *LVMH 2018 Annual Report* 102, LVMH, available at https://www.lvmh.com/2018interactiveannualreport/en/104-Thelios.html#/page/104.
[5] *Revenue of eyewear in the United States from 2014 to 2027, by product type*, STATISTA (Feb. 6, 2023), https://www.statista.com/statistics/1054371/us-eyewear-market-size-by-type/.
[6] *Id.*

primarily to other consumer eyewear products to set pricing, not to consumer contact lenses.  In fact, the basic structure of consumer eyewear sales is distinct from and independent of contact lens sales: a consumer eyewear purchase involves a one-time transaction for an eyewear product that lasts indefinitely, while contact lenses require frequent replacement and are sold in package quantities ranging from 2 to 180 lenses.

64.     Further, the products serve distinct purposes.  Nonprescription sunglasses chiefly protect from sunlight and ultraviolet radiation, while contact lenses correct vision.  In fact, eyecare professionals recommend that contact lens wearers also wear sunglasses.[7]

65.     Contact lenses are likewise not a substitute for prescription eyeglasses.  As the Fashion Houses' broad involvement in the consumer eyewear market but not the contact lens market hints, frame style plays the primary role in a consumer's selection of prescription eyeglasses.  Contact lenses are not horizontal competitors in this choice.  Additionally, for any number of medical reasons, many Americans are unable to wear contact lenses and must use eyeglasses to correct their vision.  Further, approximately a quarter of Americans with corrective vision prescriptions wear both contact lenses and prescription eyeglasses, and another third of Americans with corrective vision prescriptions are estimated to be "very interested" in owning both contact lenses and prescription eyeglasses, indicating that a majority of consumers do not consider eyeglasses and contacts to be substitutes.[8]

66.     Therefore, the relevant product market as defined includes all reasonably interchangeable products, and EssilorLuxottica and the other Defendants—who together control upwards of 80 percent of the consumer eyewear market, including a supermajority of the most popular eyewear brands in the United States—were capable of and did impose significant price

---

[7] *See, e.g.,* "5 Reasons Sunglasses are Essential For Contact Lens Wearers," SACOPEE VALLEY EYE CARE (May 28, 2019), https://sveyecare.com/blog/120993-5-reasons-sunglasses-are-essential-for-contact-lens-wearers.

[8] Dr. Darryl Glover, "Press Release: US Consumer Data Reveals Opportunity to Grow 'Dual Wearers' of Contact Lenses and Glasses," DEFOCUS MEDIA (Mar. 18, 2023), https://defocusmediagroup.com/press-release-us-consumer-data-reveals-opportunity-to-grow-dual-wearers-of-contact-lenses-and-glasses/.

increases in the market without losing a considerable number of customers to contact lenses or any other supposed alternative product.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**EssilorLuxottica**

67.     Luxottica Group S.p.A. was founded in 1961 in Agordo, Italy, by Leonardo Del Vecchio.  Luxottica Group S.p.A. was listed on the New York Stock Exchange on January 24, 1990, and on the Milan Stock Exchange in 2000.  Luxottica Group S.p.A. voluntarily de-listed from the New York Stock Exchange in June 2017.

68.     Essilor International SAS traces its roots to 1849 to a network of eyeglass assembly shops in Paris, but the entity Essilor was formed in 1972.  Essilor International SAS is the largest maker of eyeglass lenses worldwide, and it also owns consumer eyewear brands and retail outlets.

69.     In January 2017, Luxottica Group S.p.A. announced a proposed merger with Essilor International SAS.  In 2018, the merger was consummated.  EssilorLuxottica S.A. is publicly traded on the Euronext stock exchange.  As of July 2023, EssilorLuxottica S.A. has a market capitalization of approximately € 86.8 billion ($96.6 billion).  EssilorLuxottica is vertically integrated and designs, manufactures, and distributes fashion, luxury, sports, and performance eyewear.

70.     EssilorLuxottica has developed a geographic footprint that spans the United States. EssilorLuxottica's Retail Outlets operate online and in over 3,800 brick-and-mortar stores in the United States, including in California.  EssilorLuxottica acquired LensCrafters in 1995, Sunglass Hut in 2001, Pearle Vision and Target Optical in 2004, FramesDirect.com in 2009, Glasses.com in 2014, and For Eyes in 2021.

71.     EssilorLuxottica sells eyewear directly to consumers through its Retail Outlets. EssilorLuxottica also sells eyewear through ophthalmic distributors and third-party retail channels ("Third-Party Sellers").

72.     EssilorLuxottica owns several Proprietary Brands, including but not limited to Defendant Costa Del Mar, Inc. (acquired 2014), Defendant Oakley, Inc. (acquired 2007), Ray-Ban (acquired 1999), Alain Mikli (acquired 2013), Arnette (acquired 1999), Oliver Peoples (acquired

2007), Persol (acquired 1995), Sferoflex (acquired 1981), Starck Biotech Paris (acquired 2013), and Vogue Eyewear (acquired 1990).

73.     In addition to EssilorLuxottica's owned Proprietary Brands, EssilorLuxottica has exclusive licensing deals with the Fashion Houses for their eyewear brands, which include but are not limited to: Armani Exchange, Brooks Brothers, Brunello Cucinelli, Bulgari, Burberry, Chanel, Chaps, Coach, DbyD, Dolce & Gabbana, Emporio Armani, Ferrari, Giorgio Armani, Michael Kors, Miu Miu, Native, Polo Ralph Lauren, Prada, Ralph Lauren, Swarovksi, Tiffany & Co., Tory Burch, and Versace ("Licensed Brands").

74.     EssilorLuxottica sells both its Proprietary Brands and Licensed Brands in its Retail Outlets and through Third-Party Sellers.

75.     EssilorLuxottica has conducted business in California and across the United States for decades.

76.     EssilorLuxottica controls a significant portion of the American consumer eyewear market—both the prescription eyeglasses and sunglasses sub-markets—and some estimates suggest that as much as 80 percent of the greater global eyewear market was controlled by Luxottica Group S.p.A. in 2014, even before its merger with Essilor International SAS.[9]  EssilorLuxottica's net sales in North America were estimated in 2022 to amount to over $12.5 billion,[10] the majority of which derived from EssilorLuxottica's business activities in the United States, including in California.

77.     One review of internet search data—conducted by an EssilorLuxottica-owned website (though the corporate relationship of the website to EssilorLuxottica is not apparent to consumers)—found that the most popular eyewear brand in each U.S. state is an EssilorLuxottica Proprietary Brand: either Oakley, Ray-Ban, or Costa Del Mar.[11]  Upon information and belief, EssilorLuxottica owns, licenses, or has sales agreements with eight of the ten most popular eyewear

---

[9] Swanson, supra note 2.
[10] Global sales of EssilorLuxottica from 2019 to 2022, by region, STATISTA (May 24, 2023) https://www.statista.com/statistics/256550/global-net-sales-of-luxottica-by-geographical-area/.
[11] Rob Woods, "What Are the Most Popular Sunglasses in Each U.S. State and Territory," ALL ABOUT VISION,       https://www.allaboutvision.com/resources/human-interest/most-popular-sunglasses-brands-by-state/.

brands in California according to that review.[12]   In several states, including but not limited to Illinois, Florida, Massachusetts, New Jersey, Virginia, and Washington, EssilorLuxottica owns, licenses, or has sales agreements with nine of the ten most popular brands.[13]

### EssilorLuxottica's Unlawful Price-Fixing Practices

78.     Both in pursuit of and to solidify its market dominance, EssilorLuxottica has formed unlawful agreements with its horizontal competitors to fix eyewear prices across the American consumer eyewear market at supra-competitive rates.

        a.   For one, EssilorLuxottica produces and distributes eyewear for brands owned by the Fashion Houses such as Armani, Prada, Chanel, and Ralph Lauren under exclusive licensing agreements that in effect give EssilorLuxottica price-setting authority for the eyewear of each of these popular brands.

        b.   Additionally, EssilorLuxottica uses sales agreements with the Competing Eyewear Entities to market and sell brands like Gucci, Tom Ford, and Fendi in retail outlets that EssilorLuxottica owns and at prices over which EssilorLuxottica exercises control.

        c.   Further, EssilorLuxottica markets and sells its owned brands, including but not limited to Ray-Ban, Oakley, and Costa Del Mar, over which EssilorLuxottica exercises price-setting authority.

EssilorLuxottica, the Fashion Houses, and the Competing Eyewear Brands are each horizontal competitors in the eyewear market.  Nevertheless, unbeknown to consumers, these parties engage together in anticompetitive and unfair business practices through their unlawful licensing and sales agreements to exercise strategic control over the price and supply of eyewear in the American consumer eyewear market.

79.     Each of the unlawful agreements has been made in furtherance of EssilorLuxottica, the Fashion Houses, and Competing Eyewear Entities' efforts to manipulate the consumer eyewear market for their mutual benefit by charging supra-competitive prices for eyewear to consumers like

---

[12] *Id.*

[13] *Id.*  Among these states are Delaware, Florida,

Plaintiff.  And each of the unlawful agreements has, in fact, had an anticompetitive effect on the consumer eyewear market.  EssilorLuxottica and its horizontal competitors—together constituting more than two dozen of America's most popular eyewear brands—have used their unlawful agreements to artificially inflate the price of consumer eyewear by as much as 1000 percent.

*Unlawful Licensing Agreements with the Fashion Houses*

80.     The Fashion Houses produce clothing and accessories, including eyewear.  The Fashion Houses own and exploit their well-known brands, including but not limited to Chanel, Coach, Polo Ralph Lauren, Prada, and Versace.

81.     The Fashion Houses are horizontal competitors of one another in the market for eyewear and are also actual or potential horizontal competitors of EssilorLuxottica in the same market.

82.     At all material times, the Fashion Houses operated or had access to independent production facilities for the manufacture of eyewear.  Each of the Fashion Houses either produced or had the ability to produce their own eyewear at all material times.

83.     Over the course of decades, EssilorLuxottica has entered into a series of licensing agreements with each of the named Fashion Houses for their eyewear brands. The initial dates of these licensing agreements include but are not limited to:[14]

        a.   1988: Giorgio Armani

        b.   1992: Brooks Brothers

        c.   1997: Bulgari

        d.   1999: Chanel

        e.   2003: Prada

        f.   2003: Versace Group

        g.   2006: Dolce & Gabbana

        h.   2006: Burberry

---

[14] *A Fascinating History, An Unstoppable Journey: A Future to be Built Day by Day*, LUXOTTICA, available at https://www.luxottica.com/sites/luxottica.com/modules/tt_luxhistory/pdf/Luxottica_History_ENG_WEB_10.pdf.

15

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**
*Fathmath v. EssilorLuxottica S.A., et al.,* United States District Court Northern District of California

1        i.   2007: Ralph Lauren

2        j.   2008: Tiffany

3        k.   2009: Tory Burch

4        l.   2012: Coach

5        m.   2015: Michael Kors

6        n.   2022: Swarovski[15]

84. EssilorLuxottica has maintained these licensing agreements and has signed lengthy renewal agreements with the Fashion Houses to uphold its market dominance. These renewal agreements include but are not limited to:

    a.   2014: A ten-year renewal with Tory Burch.[16]

    b.   2015: A ten-year renewal with Burberry.[17]

    c.   2015: A ten-year renewal with Dolce & Gabbana.[18]

    d.   2015: A ten-year renewal with Michael Kors.[19]

    e.   2015: A ten-year renewal with Prada.[20]

    f.   2016: A ten-year renewal with Ralph Lauren.[21]

---

[15] "Swarovski and EssilorLuxottica announce a ten-year licensing agreement," ESSILORLUXOTTICA (Dec. 6, 2022), https://www.essilorluxottica.com/en/newsroom/press-releases/swarovski-and-essilorluxottica-license-agreement/.
[16] "Luxottica and Tory Burch Renew Eyewear License Agreement," LUXOTTICA (Dec. 19, 2014), https://www.luxottica.com/en/luxottica-and-tory-burch-renew-eyewear-license-agreement.
[17] "Luxottica and Burberry Renew Eyewear License Agreement," FASHION NETWORK (July 30, 2015), https://www.fashionnetwork.com/news/luxottica-and-burberry-renew-eyewear-license-agreement,555423.html.
[18] "Luxottica Group and Dolce&Gabbana Renew Eyewear License Agreement," LUXOTTICA (Dec. 16, 2015), https://www.luxottica.com/en/luxottica-group-and-dolcegabbana-renew-eyewear-license-agreement.
[19] "Luxottica Signs New Eyewear License with Michael Kors," VISION MONDAY (Apr. 16, 2014), https://www.visionmonday.com/latest-news/article/luxottica-signs-new-eyewear-license-with-michael-kors-1.
[20] "Luxottica and Prada Renew Eyewear License Agreement," FASHION NETWORK (May 15, 2015), https://ww.fashionnetwork.com/news/luxottica-and-prada-renew-eyewear-license-agreement,485947.html.
[21] "Luxottica Group and Ralph Lauren Renew Eyewear License Agreement," LUXOTTICA (Dec. 22, 2016), https://www.luxottica.com/en/luxottica-group-and-ralph-lauren-renew-eyewear-license-agreement-0.

g.  2017: A ten-year renewal with Tiffany & Co.[22]

h.  2020: A five-year renewal with Chanel.[23]

i.  2020: A ten-year renewal with Versace Group.[24]

j.  2021: A three-year renewal with Bulgari.[25]

k.  2021: A five-year renewal with Coach.[26]

l.  2023: A fifteen-year renewal with Armani Group.[27]

85.  Upon information and belief, the licensing agreements between EssilorLuxottica and the Fashion Houses have certain basic terms.  The licensing agreements are *inter alia* exclusive multiyear licenses for the design, manufacture, and distribution of eyewear—including distribution directed to the United States—under the brands of the Fashion Houses ("Licensing Agreements"). In exchange for the grants of the licenses, EssilorLuxottica pays the Fashion Houses royalties on the sales of their eyewear.

86.  Upon information and belief, under the Licensing Agreements, EssilorLuxottica is designated the agent of the Fashion Houses vis-à-vis their eyewear brands.  In particular, pricing decisions are delegated to EssilorLuxottica.  In the alternative, the Licensing Agreements include most-favored nation and other price-coordination clauses, which result in the alignment and inflation of prices to supra-competitive levels for the benefit of EssilorLuxottica and the Fashion Houses collectively.

---

[22] "Tiffany & Co. Strengthens Eyewear Offering with Renewed Luxottica License Agreement," LUXOTTICA (Dec. 14, 2017), https://www.luxottica.com/en/tiffany-co-strengthens-eyewear-offering-renewed-luxottica-license-agreement.

[23] "Chanel and Luxottica Group Renew Eyewear License Agreement," LUXOTTICA (Oct. 22, 2019), https://www.luxottica.com/en/chanel-and-luxottica-group-renew-license-agreement.

[24] "Luxottica Group and Versace Renew Eyewear License Agreement," LUXOTTICA (Apr. 10, 2020), https://www.luxottica.com/en/luxottica-group-and-versace-renew-license-agreement.

[25] "Luxottica Group and Bulgari SpA Renew Eyewear License Agreement," LUXOTTICA (Jul. 31, 2019), https://www.luxottica.com/en/luxottica-group-and-bulgari-spa-renew-license-agreement.

[26] "EssilorLuxottica and Coach Renew Global License Agreement," ESSILORLUXOTTICA (June 25, 2021), https://www.essilorluxottica.com/en/newsroom/press-releases/essilorluxottica-and-coach-renew-global-license-agreement/.

[27] "EssilorLuxottica and the Armani Group Announce 15-Year Licensing Renewal," ESSILORLUXOTTICA (Sept. 13, 2022), https://www.essilorluxottica.com/en/newsroom/press-releases/15-year-licensing-renewal-armani/.

*Sales Agreements with Competing Eyewear Entities*

87.     In addition to the Licensing Agreements with the Fashion Houses, upon information and belief, EssilorLuxottica maintains sales agreements with eyewear manufacturers, owners, or license-holders who are actual or potential horizontal competitors to EssilorLuxottica, by which EssilorLuxottica agrees to sell the Competing Eyewear Entities' eyewear brands in its various Retail Outlets.

88.     For example, EssilorLuxottica sells sunglasses in its Sunglass Hut locations owned, licensed, or manufactured by Defendants Kering Eyewear S.p.A., Marcolin S.p.A., Christian Dior SE, LVMH, and Thélios S.p.A.

89.     Brands owned, licensed, or manufactured by Kering Eyewear S.p.A. for sale at Sunglass Hut include, but are not limited to, Balenciaga, Chloe, Gucci, Maui Jim, and Saint Laurent.  Gucci and Maui Jim are both among the ten most popular brands in California and many other States.[28]

90.     Brands owned, licensed, or manufactured by Marcolin S.p.A. for sale at Sunglass Hut include, but are not limited to, Tom Ford.  Tom Ford is among the ten most popular brands in California and many other States.[29]

91.     Brands owned, licensed, or manufactured by Christian Dior SE for sale at Sunglass Hut include, but are not limited to, Dior.

92.     Brands owned, licensed, or manufactured by Defendants LVMH and Thélios S.p.A. for sale at Sunglass Hut include, but are not limited to, Celine and Fendi.  Defendant Thélios S.p.A. exists solely to design, produce, and distribute Defendant LVMH's branded eyewear.  Celine is among the ten most popular brands in California, and Celine and Fendi both appear among the ten most popular brands in several other States.[30]

93.     Upon information and belief, the sales agreements between EssilorLuxottica and the Competing Eyewear Entities have certain basic terms.  The sales agreements are *inter alia* multi-

---

[28] *See* Woods, supra note 11.
[29] *Id.*
[30] *Id.*

year licenses for the distribution and sale of eyewear ("Sales Agreements").   Under the Sales Agreements, EssilorLuxottica pays the Competing Eyewear Entities (or their relevant fashion houses) royalties or a portion of the gross total of sales on eyewear sold through EssilorLuxottica's Retail Outlets.

94.     Under the Sales Agreements, EssilorLuxottica is designated the agent of the Competing Eyewear Entities or their corresponding fashion houses vis-à-vis their eyewear brands. In particular, pricing decisions for sales through the Retail Outlets are designated to EssilorLuxottica.  In the alternative, the Sales Agreements include most-favored nation and other price-coordination clauses, which result in the alignment and inflation of prices to supra-competitive levels for the benefit of EssilorLuxottica and the Competing Eyewear Entities collectively.

*Anticompetitive and Unfair Price-Fixing*

95.     The existence of the Licensing Agreements between EssilorLuxottica and each of the Fashion Houses, and the existence of the Sales Agreements between EssilorLuxottica and each of the Competing Eyewear Entities, is and has always been known to each of the Fashion Houses and Competing Eyewear Entities.  The fact that EssilorLuxottica is a party to and privy to all of the Licensing Agreements and Sales Agreements is and has always been known to each of the Fashion Houses and the Competing Eyewear Entities.

96.     The Fashion Houses and Competing Eyewear Entities entered into the Licensing Agreements and Sales Agreements with EssilorLuxottica (and through it, their competitors) with the intention of benefitting from the coordination of distribution and pricing, access to pricing information, and the ability to charge supra-competitive prices for their eyewear, including through the payment of royalties by EssilorLuxottica.

97.     EssilorLuxottica entered into the Licensing Agreements and Sales Agreements with the competitor Fashion Houses and Competing Eyewear Entities with the intention of benefitting from the coordination of distribution and pricing, access to pricing information, the ability to charge supra-competitive prices for its eyewear, and to exercise control over the production and supply of eyewear.

98.     Further, unfairly and deceptively, EssilorLuxottica does not identify for consumers in its Retail Outlets that it is the exclusive licensee, manufacturer, and/or distributor of the vast majority of the eyewear it sells.  Nor does EssilorLuxottica disclose to consumers that it has contractual agreements with its competitors that ensure the Proprietary Brands, Licensed Brands, and the brands of the Competing Eyewear Entities are each artificially inflated to supra-competitive prices.

99.     Through these anticompetitive and unfair Licensing Agreements and Sales Agreements, EssilorLuxottica ensures that eyewear for its Proprietary Brands, Licensed Brands, and the brands of the Competing Eyewear Entities—all of which are actual or potential horizontal competitors—are priced at supra-competitive rates within the Retail Outlets to the injury of consumers like Plaintiff and for the collective benefit of Defendants EssilorLuxottica, Frames for America, Inc., For Eyes Optical Company, Inc., Costa Del Mar, Inc., Oakley, Inc., the Fashion Houses, and the Competing Eyewear Entities.

100.     EssilorLuxottica does not stop there.  In addition to price-fixing within its own Retail Outlets, upon information and belief, EssilorLuxottica imposes discount restrictions on Third-Party Sellers.[31]  These restrictions secure the price-fixing scheme across the consumer eyewear market.  The restrictions prevent Third-Party Sellers from marketing EssilorLuxottica Proprietary Brands or Licensed Brands at a discounted rate.  The discount restrictions ensure that no matter the retailer, whether beholden to EssilorLuxottica directly or by contract, the artificial price inflation remains.

101.     EssilorLuxottica's unlawful Licensing Agreements, Sales Agreements, and discount restrictions with the Fashion Houses, Competing Eyewear Entities, and Third-Party Sellers have injured Plaintiff and Class Members and continue to injure consumers nationwide.  The eyewear over which EssilorLuxottica exercises price-fixing ability is not worth the price consumers pay.  Some have estimated that the mark-up on consumer eyewear runs as high as 1000 percent.[32]  E.

---

[31] EyeMed's Provider Manual reminds Independent Providers of these restrictions.  *See* Exhibit 1, EyeMed Provider Manual, at 39 (also available at https://www.eyemedinfocus.com/wp-content/uploads/2023/05/April-2023-PM-Final-Clean-4.10.23.pdf).

[32] David Lazarus, "Column: Why are glasses so expensive? The eyewear industry prefers to keep that blurry," L.A. TIMES (Jan. 22, 2019), https://www.latimes.com/business/lazarus/la-fi-lazarus-why-are-eyeglasses-so-expensive-20190122-story.html.

Dean Butler, the founder of LensCrafters, has explained that consumers could purchase designer-level frames for $15 and "first-quality lenses for $1.25 apiece," and laughingly acknowledged that the retail price of eyewear in America is artificially inflated: "It's ridiculous.  It's a complete rip-off."[33]  Indeed, many non-prescription Ray-Ban sunglasses retail for over $450, with some frames priced at over $1,000.  Other EssilorLuxottica non-prescription sunglass brands like Oliver Peoples sell for nearly $400 at Sunglass Hut for the cheapest frames and run as high as $1,750.  Prescription lenses only add to the EssilorLuxottica price tags.

102.    EssilorLuxottica's anticompetitive and unfair acts and omissions lead American eyewear consumers to believe that they have a choice of fairly priced eyewear among over two dozen of the most well-known (and ostensibly competitive) brands.  But the American consumer eyewear market is fixed.  EssilorLuxottica and the Defendants described above engage in price-fixing schemes for their collective financial gain, deceiving consumers into purchasing eyewear products at supra-competitive prices from EssilorLuxottica's Retail Outlets and Third-Party Sellers.  As LensCrafters' founder E. Dean Butler said of EssilorLuxottica: "If that's not a monopoly, I don't know what is."[34]

### EssilorLuxottica's Unlawful Consumer Channeling Practices

103.    Price-fixing with its horizontal competitors is not enough for EssilorLuxottica.  EssilorLuxottica further perpetuates its price-fixing scheme through the deceptive channeling of millions of eyecare patients to the purchase of the conglomerate's eyewear.

104.    EssilorLuxottica accomplishes this through EyeMed, its wholly owned subsidiary and one of the largest vision benefits companies in the United States.  EyeMed insures nearly 72 million members and proclaims itself "America's fastest growing vision benefits company,"[35] and

---

[33] David Lazarus, "Column: How badly are we being ripped off on eyewear? Former industry execs tell all," L.A. Times (Mar. 5, 2019), https://www.latimes.com/business/lazarus/la-fi-lazarus-glasses-lenscrafters-luxottica-monopoly-20190305-story.html.
[34] Id.
[35] Vision benefits for every pair of eyes, EyeMed, https://www.eyemed.com/en-us (last visited July 21, 2023).

its provider list as "America's largest vision network."[36]   According to at least one article, EssilorLuxottica exercises "control over 83 percent of optometrists" through EyeMed.[37]

105.   EyeMed's practices are both anticompetitive and unfair to consumers.   Upon information and belief, EyeMed mandates and financially incentivizes its thousands of in-network providers to market and/or sell a certain inventory of over-priced EssilorLuxottica eyewear to consumers.   EyeMed conceals these requirements and incentives from members.   Further, EyeMed itself markets EssilorLuxottica eyewear directly to its millions of members, unreasonably failing to disclose its corporate ties to the eyewear brands.

106.   These consumer channeling practices are contrary to the American Optometric Association's Standards of Professional Conduct:

"The care of a patient should never be influenced by the self-interests of the provider. Optometrists should avoid and/or remove themselves from any situation that presents the potential for a conflict of interest where the optometrist's self-interests are in conflict with the best interests of the patient.  Disclosure of all existing or potential conflicts of interest is the responsibility of the optometrist and should be appropriately communicated to the patient."[38]

EyeMed deceives its members as to their eyecare professionals' independence and loyalty, creating conflicts of interest for the purpose of channeling consumers to EssilorLuxottica's eyewear by the means described below.

*Vision Source and the Independent Providers Deceptively Perpetuate the Price-Fixing Scheme*

107.   EyeMed markets to members a network of "independent" eyecare providers ("Independent Providers").   Each of the Independent Providers offers optometrists' and/or opticians' services to fit and assist consumers in purchasing appropriate prescription eyewear. Concealed from consumers, however, is the fact that each of these Independent Providers has anticompetitive arrangements with EssilorLuxottica and/or EyeMed.

---

[36]   *There's a reason 71 million members choose EyeMed,* EYEMED, https://member.eyemedvisioncare.com/member/en (last visited July 21, 2023).
[37] Balto, *supra* note 3.
[38]   *Standards of Professional Conduct*, AMERICAN OPTOMETRIC ASSOCIATION (June 2011), available at https://www.aoa.org/AOA/Documents/About%20the%20AOA/Ethics%20%26%20Values/Standards-of-Professional-Conduct_Adopted-June-2011.pdf.

22

108.     Indeed, a significant number of these "Independent Providers" are not independent of the EssilorLuxottica corporate structure at all.  Defendant Vision Source—which touts itself as "a family of 3,100 locally owned optometric practices,"[39] and claims that its mission is to enable "independent optometrists to reach their full potential"[40]—is actually a wholly owned subsidiary of Essilor of America, Inc., and functions to deceptively perpetuate EssilorLuxottica's price-fixing scheme.

109.     Vision Source's network includes 4,500 optometrists, treats "an estimated 16 million patients every year,"[41] and is the largest optical retailer in the United States.  In 2022, Vision Source's revenue in the American eyewear market exceeded $2.6 billion.[42]

110.     Each of Vision Source's 3,100 optometric practices are franchisees who, upon information and belief, are bound by a number of anticompetitive and unfair requirements to maintain or market a certain inventory of EssilorLuxottica eyewear products, and/or to ensure that a certain portion or gross total of the franchisees' eyewear sales to EyeMed members are derived from EssilorLuxottica products.

111.     Vision Source does not reasonably disclose to consumers that it is a wholly owned subsidiary of EssilorLuxottica, or that each of its franchisees are bound by anticompetitive obligations to peddle supra-competitively priced EssilorLuxottica products.  Rather, Vision Source deceives consumers into believing that it is merely a network of private family optometry practices.  Many Vision Source franchisees do not even identify on their websites or in their business names that they are tied to Vision Source and EssilorLuxottica.  Reasonable consumers believe, as Vision Source would have them, that these are private, independent practices.  Vision Source goes so far as to market to consumers that the company will connect them with "Private Practice Optometrists"

---

[39] *Extraordinary Eye Care Provided by Extraordinary Eye Care Professionals*, VISION SOURCE (last visited July 21, 2023), https://visionsource.com/.
[40] *Mission & Vision*, VISION SOURCE (last visited July 21, 2023), https://visionsource.com/about/vision-and-mission/.
[41] *Company History & Facts*, VISION SOURCE (last visited July 21, 2023), https://visionsource.com/about/history-facts/.
[42] "Key Optical Players Ranked by U.S. Sales in 2022," VISION MONDAY, (available at https://www.visionmonday.com/CMSDocuments/2023/06/vmtop50retailerschart_2023.pdf).

to serve as their "family eye doctor," form with them a "special relationship," and ensure that decisions regarding patients' "eye health . . . are based upon what is best for your eyes."[43]  In truth, Vision Source does not act in the best interests of its patients' eyes, but in the best interests of EssilorLuxottica.

112.    Upon information and belief, each of the remaining Independent Providers contracts or is otherwise required to conduct business with EssilorLuxottica as a condition of their inclusion on the EyeMed in-network provider list.

113.    Under the contracts between EyeMed and the Independent Providers, EyeMed markets the Independent Providers' services to its members and in exchange, the Independent Providers accept certain reimbursement rates from EyeMed and agree to be bound by a number of anticompetitive and unfair terms that favor EssilorLuxottica, including but not limited to the following:

    a.  EyeMed requires as a baseline condition that its providers "have to be in good standing with EssilorLuxottica and all relevant subsidiaries."[44]  That is, EyeMed directly mandates as a condition of joining the largest vision benefits network in America that Independent Providers treat with special favor a host of EssilorLuxottica entities.  EyeMed conceals this information from members.[45]

    b.  EyeMed additionally mandates that unless a specific contract allows otherwise, all providers are "you must use our network labs . . . for all EyeMed member eyewear."[46]  EyeMed states that this lab network includes "Essilor labs, Walman labs and Luxottica Lab Services (LLS)."[47]  Upon information and belief, these contracted labs are controlled by EssilorLuxottica.  EyeMed likewise conceals from its members that the in-network providers they visit, even Independent

---

[43] *Why Vision Source?*, VISION SOURCE (last visited July 21, 2023), https://visionsource.com/patients/why-vision-source/.
[44] Exhibit 1 at 4.
[45] *Id.* at 3 ("This Provider Manual is confidential and should not be shared with third parties.").
[46] *Id.* at 68.
[47] *Id.*

1    Providers, are required to use EssilorLuxottica-controlled labs to produce

2    members' eyewear.

3        c.  Even more than requiring that providers order eyewear through

4        EssilorLuxottica-controlled labs, EyeMed also requires that "[w]hen using the

5        lab network for eyewear orders, you're [the providers] required to order lenses

6        listed in the Essilor or Luxottica Lab Services product catalogs."[48]   In other

7        words, EyeMed requires that its providers fulfill consumers' orders both through

8        EssilorLuxottica labs and with EssilorLuxottica products.

9        *EssilorLuxottica's Retail Outlets Deceptively Perpetuate the Price-Fixing Scheme*

10        114.   Further, among brick-and-mortar Retail Outlets, EyeMed's webpages advertise only

11    those outlets owned by EssilorLuxottica, which primarily or solely market EssilorLuxottica

12    eyewear products: LensCrafters, Pearle Vision, and Target Optical.[49]   EyeMed does not disclose

13    on its website that each of these outlets is part of the same eyewear conglomerate to which EyeMed

14    itself belongs.

15        115.   EyeMed also markets online Retail Outlet sales, claiming that the company

16    "believe[s] in benefits without boundaries"[50]—though all the while bordering its unwitting

17    members within walls of the EssilorLuxottica conglomerate.   EyeMed markets only the sales

18    webpages of EssilorLuxottica-owned Retail Outlets like LensCrafters, Target Optical, Ray-Ban,

19    and Glasses.com, concealing from consumers that the vision benefits provider operates to

20    perpetuate EssilorLuxottica's price-fixing scheme.

21        *EyeMed Deceptively Directs Consumers to Providers with the Most Favorable*

22        *Arrangements with EssilorLuxottica*

23

24

25

26    _____

27    [48] *Id.* at 69.
    [49] *See* EYEMED, supra note 35.
28    [50]   *There's more in store – online,* EYEMED (last visited July 21, 2023),
    https://www.eyemed.com/en-us/member/benefits/online-options.

116.    EyeMed additionally employs a tiered provider marketing system, advertising a category of "PLUS Providers" to its members and promising that at these locations members will "maximize your benefits, with extra coverage to help you save even more."[51]

117.    Upon information and belief, PLUS Providers are in-network providers who (1) are owned by EssilorLuxottica, (2) are Vision Source franchisees, or (3) have entered into additional agreements with EyeMed and/or EssilorLuxottica to maintain or market a certain inventory of EssilorLuxottica eyewear products, and/or to ensure that a certain portion or gross total of the in-network providers' eyewear sales to EyeMed members are traceable to EssilorLuxottica products. EyeMed does not disclose to members that the "PLUS Provider" distinction is associated with certain requirements to stock, market, and/or sell EssilorLuxottica eyewear.

118.    In sum, EssilorLuxottica uses EyeMed as a channel by which it furthers its anticompetitive price-fixing scheme.  EyeMed both directly steers unsuspecting members to EssilorLuxottica's eyewear and imposes anticompetitive conditions on its in-network providers—which include over 80 percent of American optometrists[52]—to incentivize and mandate preferential treatment toward the conglomerate, through which EssilorLuxottica unfairly peddles its over-priced eyewear to millions of consumers.  Meanwhile, members are left in the dark as to these anticompetitive and disloyal arrangements that funnel them to EssilorLuxottica's eyewear.  Even EyeMed's founder E. Dean Butler has referred to the pressures EssilorLuxottica exerts on eyecare professionals as "an incredible conflict of interest," stating that "[t]he vision plans are manipulating the market for their own benefit," and that "[o]ptometrists have lost control of their own profession."[53]

119.    Independent Providers cave to EssilorLuxottica's anticompetitive and unfair business practices because of EyeMed's dominance in the American vision benefits market.  Any

---

[51] *Find an eye doctor,* EYEMED, https://eyedoclocator.eyemedvisioncare.com/member/en/ (the quoted language appears upon entering a search location) (last visited July 21, 2023).

[52] Balto, supra note 3.

[53] David Lazarus, "Column: Vision insurers have rigged the market to get you to buy their glasses," L.A. TIMES (Mar. 19, 2019), https://www.latimes.com/business/lazarus/la-fi-lazarus-eyewear-vision-plans-20190319-story.html.

provider who runs afoul of EyeMed or the greater EssilorLuxottica machine risks losing access to EyeMed's nearly 72 million members.

120.    EssilorLuxottica's unlawful practices through EyeMed are especially egregious considering the duty of loyalty consumers reasonably expect from the eyecare professionals they visit.  Not only are members unaware of EyeMed's relationship with EssilorLuxottica and its prescription Retail Outlets, or of the demands EyeMed imposes on Independent Providers, but members are affirmatively harmed by the conflicts of interest created by the hidden, predatory, and anticompetitive relationships between EyeMed and its in-network providers—entities purportedly dedicated to quality eyecare—for the financial benefit of EssilorLuxottica.

121.    Through the above-described anticompetitive and unfair business practices, consumers are deceived into purchasing eyewear products with artificially inflated price tags from Retail Outlets and Independent Providers who, unbeknown to consumers, have incentives and mandates to push EssilorLuxottica's eyewear—whether directly as subsidiaries of EssilorLuxottica or indirectly through contracts with EyeMed and/or EssilorLuxottica.

**Anticompetitive Effects of the Unlawful Practices**

122.    EssilorLuxottica's authority to set eyewear prices on behalf of itself, the Fashion Houses, and the Competing Eyewear Entities under the unlawful Licensing Agreements and Sales Agreements permits EssilorLuxottica to charge supra-competitive prices for all eyewear it sells to consumers.  EssilorLuxottica also benefits from anticompetitive arrangements it imposes on Third-Party Sellers to prohibit unauthorized eyewear discounts, increasing EssilorLuxottica's profit margins and market power at consumers' expense.

123.    EssilorLuxottica additionally benefits from anticompetitive agreements formed through its subsidiary EyeMed with thousands of American eyecare providers, which perpetuate EssilorLuxottica's price-fixing scheme.  EyeMed requires that its in-network providers maintain good standing with EssilorLuxottica and its subsidiaries, forces providers to use EssilorLuxottica products and services to fulfill eyewear orders, and mandates that providers market and/or sell a certain array of supra-competitively priced EssilorLuxottica eyewear products to consumers, thereby increasing EssilorLuxottica's profit margins and market power at consumers' expense.

1

**CONCEALMENT OF UNLAWFUL AGREEMENTS**

2      124.    Defendants committed to keep the terms of their unlawful agreements concealed

3  from Plaintiff and Class Members.  Upon information and belief, each Licensing Agreement, Sales

4  Agreement, and all agreements between EssilorLuxottica or EyeMed and its in-network providers

5  contained a provision preventing the parties from disclosing the agreements' terms to the public.

6  As a result, Plaintiff was impeded from learning of the facts needed to commence suit against

7  Defendants.

8

**CLASS REPRESENTATION ALLEGATIONS**

9      125.    Plaintiff brings certain claims, *infra*, on behalf of similarly situated persons against

10  Defendants under Fed. R. Civ. P. 23(a) and 23(b)(3) and seeks certification of classes defined as

11  follows:

12      126.    **EssilorLuxottica National Consumer Class** (hereinafter the "Class"): Plaintiff

13  proposes that the Class be defined as follows: all persons in the United States who have purchased

14  any non-contact-lens eyewear product of a brand owned or licensed by EssilorLuxottica, or for

15  which EssilorLuxottica has a Sales Agreement, including the brands of the Fashion Houses and

16  Competing Eyewear Entities.

17           a.   **EyeMed Subclass:** Plaintiff proposes that an EyeMed subclass be defined for

18               all members of the Class who purchased any eyewear product of a brand owned

19               or licensed by EssilorLuxottica, including the brands of the Fashion Houses and

20               Competing Eyewear Entities, that was discounted or wholly or in-part

21               reimbursed through any EyeMed vision benefits plan.

22           b.   **California Consumer Subclass:** Plaintiff proposes that a California Consumer

23               subclass be defined for all members of the Class who purchased in California

24               any eyewear product of a brand owned or licensed by EssilorLuxottica,

25               including the brands of the Fashion Houses and Competing Eyewear Entities.

26           c.   **California EyeMed Subclass:** Plaintiff proposes that a California Eyemed

27               subclass be defined for all members of the Class who purchased in California

28               any eyewear product of a brand owned or licensed by EssilorLuxottica,

including the brands of the Fashion Houses and Competing Eyewear Entities, that was discounted or wholly or in-part reimbursed through any EyeMed vision benefits plan (together with the EyeMed Subclass and California Consumer Subclass, the "Subclasses").

127.     For purposes of defining the class period, discovery will reveal when the unlawful conduct occurred.  The class period's end date will be the date of class certification.  Alternatively, if the Court determines that the running of the statute of limitations was not tolled by Defendants' concealment, the class period will be from July 21, 2019, to the date of class certification.

128.     Plaintiff reserves the right to amend this definition as discovery proceeds and to conform to the evidence.

129.     Excluded from the Class are Defendants, their agents, representatives, and employees; any judge to whom this action is assigned; and any member of that judge's staff and immediate family.

130.     While the exact number of the Class and Subclasses are unknown at this time, Plaintiff submits that, upon information and belief, there are millions of individuals throughout the United States who are potential members of the Class and thousands of individuals who are potential members of each of the Subclasses in this action.  Because the Class Members are so numerous, individual joinder of these members is impracticable.

131.     Plaintiff further alleges the Class Members will be ascertainable through Defendants' electronic records, data, and databases.

132.     There are common questions of law and/or fact shared by Plaintiff and each Class Member. The common questions of law and/or fact include, but are not limited to, the following:

a.   whether Defendants entered agreements which restrained competition;

b.   whether such agreements are unlawful;

c.   whether Defendants' conduct injured consumers; and

d.   the appropriate nature of class-wide injunctive or other equitable relief.

133.     Certification of the Class and the Subclasses under Fed. R. Civ. P. 23(a) and 23(b)(3) is appropriate as to the members of the putative classes in that common questions predominate over

29

any individual questions and a class action is superior for the fair and efficient adjudication of this controversy. All Class Members were subject to the same conduct by Defendants, as such conduct is Defendants' standard business practice.

134.     A class action will cause an orderly and expeditious administration of claims by the members of the Class, and economies of time, effort, and expenses will be fostered and uniformity of decisions will be ensured.

135.     Plaintiff's claims are typical of the claims of the Class and the Subclasses pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) since they are based on and arise out of identical facts constituting the wrongful conduct of Defendants.

136.     Plaintiff is an adequate representative of the Class and the Subclasses because her interests do not conflict with the interests of other class members, and she will fairly and adequately protect their interests. Additionally, Plaintiff is cognizant of her responsibility as a class representative and has retained experienced counsel fully capable of, and intent upon, vigorously pursuing the action. Class counsel have extensive experience in class action litigation.

137.     The Class Members have suffered actual damages, losses, and harms as those sustained by Plaintiff, including statutory damages.

## COUNT I

## VIOLATIONS OF THE SHERMAN ANTITRUST ACT,

## 15 U.S.C. § 1, ET SEQ.

138.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–137 as if fully set forth herein.

139.     This claim is brought by Plaintiff individually and on behalf of the Class, including the EyeMed Subclass, against all Defendants.

140.     Defendants entered into and engaged in unlawful agreements that unreasonably restrained trade in violation of §§ 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 3.  The restraint of trade consisted of a continuing agreement, understanding, or concerted action between and among Defendants by which Defendants fixed the price of eyewear in the American consumer eyewear market at supra-competitive rates and channeled consumers to these eyewear products.

141.    Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among Defendants and other unnamed entities. Defendants' actions constitute per se violations of the Sherman Antitrust Act, and are, in any event, unreasonable and unlawful restraint of trade.

142.    There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade.   Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

143.    Defendants' agreements and the resulting impact on the price of consumer eyewear occurred in and affected interstate commerce and commerce in and between the Territories of the United States.

144.    As a direct, intended, foreseeable, and proximate result of Defendants' agreements and overt acts taken in furtherance thereof, Defendants' unlawful conduct injured Plaintiff and Class Members, who seek damages in an amount to be proven at trial under § 4 of the Clayton Act, which is codified at 15 U.S.C. § 15.   Plaintiff and each Class Member's damages are directly attributable to Defendants' conduct, which resulted in all Class Members paying artificially inflated prices for eyewear during the class period that they would not have otherwise paid but for Defendants' agreements.

145.    Plaintiff and Class Members' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

146.    Each Defendant is jointly and severally liable for the harm caused by its conduct or by EssilorLuxottica from the time each Defendant entered into an anticompetitive agreement to the present.

## COUNT II

## VIOLATIONS OF THE CARTWRIGHT ACT,

## CAL. BUS. & PROF. CODE § 16720, ET SEQ.

147.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–137 as if fully set forth herein.

148.    This claim is brought by Plaintiff individually and on behalf of the California Consumer Subclass and California EyeMed Subclass against all Defendants.

149.    The acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16720, et seq.

150.    Defendants entered into and engaged in unlawful agreements that unreasonably restrained trade in violation of the Cartwright Act.  The restraint of trade consisted of a continuing agreement, understanding, or concerted action between and among Defendants by which Defendants fixed the price of eyewear in the consumer eyewear market at supra-competitive rates and channeled consumers to these eyewear products.

151.    Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among Defendants and other unnamed entities.  Defendants' actions constitute per se violations of the Cartwright Act, and are, in any event, unreasonable and unlawful restraint of trade.

152.    There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade.   Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

153.    As a direct, intended, foreseeable, and proximate result of Defendants' agreements and overt acts taken in furtherance thereof, Defendants' unlawful conduct injured Plaintiff and Class Members, who seek damages in an amount to be proven at trial under Cal. Bus. & Prof. Code § 16750.  Plaintiff and each Class Member's damages are directly attributable to Defendants' conduct, which resulted in all Class Members paying artificially inflated prices for eyewear during the class period that they would not have otherwise paid but for Defendants' agreements.

154.    Plaintiff and Class Members' injuries are of the type the Cartwright Act was designed to prevent, and flow from that which makes Defendants' conduct unlawful.

155.    Each Defendant is jointly and severally liable for the harm caused by its conduct or by EssilorLuxottica from the time each Defendant entered into an anticompetitive agreement to the present.

## COUNT III

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW,

## CAL. BUS. & PROF. CODE § 17200, ET SEQ.

156.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1–137 as if fully set forth herein.

157.    This claim is brought by Plaintiff individually and on behalf of the California Consumer Subclass and California EyeMed Subclass against all Defendants.

158.    Defendants committed acts of unfair competition, as described above, in violation of the Unfair Competition Law ("UCL").

159.    Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, violations of the Sherman Antitrust Act, 15 U.S.C. § 1, et seq. and the Cartwright Act, Cal. Bus. & Prof. Code § 16720, et seq.

160.    Defendants EssilorLuxottica, Frames for America, Inc., For Eyes Optical Company, Inc., Costa Del Mar, Inc., Oakley, Inc, the Fashion Houses, and the Competing Eyewear Entities' conduct separately constitutes "unfair" business practices within the meaning of the UCL because, as described in the preceding paragraphs, these Defendants' practices of fixing eyewear prices across competitor brands at supra-competitive rates are unscrupulous, unethical, and substantially injurious to Plaintiff and Class Members, are not outweighed by any utility from the practices, and were not reasonably avoidable by Plaintiff and Class Members.  Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

161.    Additionally, Defendants EssilorLuxottica, EyeMed, and Vision Source's conduct constitutes "unfair" business practices within the meaning of the UCL because, as described in the preceding paragraphs, these Defendants' channeling of consumers to supra-competitively priced eyewear through concealed financial incentives and corporate relationships between consumers' eyecare professionals and the EssilorLuxottica behemoth are unscrupulous, unethical, and substantially injurious to Plaintiff and Class Members, are not outweighed by any utility from the practices, and were not reasonably avoidable by Plaintiff and Class Members.  Any purported

1   benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of

2   Defendants' conduct.

3       162.    Defendants' conduct, as alleged herein, is and was contrary to California public

4   policy and numerous legislatively declared policies, including the Sherman and Cartwright Acts.

5   Defendants' conduct contravenes the spirit and purpose of these statutes and further violates these

6   laws, with an actual adverse impact on competition.

7       163.    Defendants' conduct, as described above, also constitutes a "fraudulent" business

8   practice violative of the UCL.  Defendants' unlawful agreements and actions, as explained in the

9   preceding paragraphs, fraudulently raise the price of consumer eyewear in California and channel

10  consumers to that supra-competitively priced eyewear.  This conduct was designed to—and did—

11  deceive consumers as to the true quality and value of the consumer eyewear they purchased.

12      164.    Defendants knew or should have known that their agreements and conduct

13  constituted unlawful, unfair, and fraudulent business practices that were likely to deceive a

14  reasonable consumer.

15      165.    Plaintiff and Class Members have suffered injuries in fact and have lost money as a

16  result of each Defendant's UCL violations in that they were deceived into purchasing consumer

17  eyewear at a much higher price than its fair value would have allowed in a competitive market.

18      166.    At a minimum, to the extent the Court ultimately deems inadequate the remedies at

19  law that Plaintiff requests, Plaintiff and Class Members are entitled to equitable relief such as

20  restitution and injunctive relief under Cal. Bus. and Prof. Code § 17203 enjoining Defendants from

21  continuing to conduct business through unlawful, unfair, and fraudulent acts and practices.

22                              **PRAYER FOR RELIEF**

23      Plaintiff and the Class Members seek the following relief:

24          a.  Certification of the Class and Subclasses;

25          b.  Enter a judgment awarding Plaintiff and the Class Members treble damages for

26              the injuries they suffered as a result of Defendants' unlawful conduct;

27          c.  Award to Plaintiff and Class Members their costs of suit, including reasonable

28              attorneys' fees and expenses, pursuant to 15 U.S.C. § 15(a);

34

d.  Order that Defendants, their directors, officers, parents, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing any additional violations of the law as alleged herein; and

e.  Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury on all issues that can be tried to a jury.

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**
*Fathmath v. EssilorLuxottica S.A., et al.,* United States District Court Northern District of California

**APPENDIX**

167.  "**Defendants**" refers collectively to all named defendants to this action.

168.  "**EssilorLuxottica**" refers collectively to Defendants EssilorLuxottica S.A., Luxottica Group, S.p.A., Essilor International SAS, GrandVision BV, EssilorLuxottica USA Inc., Luxottica U.S. Holdings Corp., Essilor of America Holding Company, Inc., Luxottica of America, Inc., and Essilor of America Inc.

169.  "**Fashion Houses**" refers collectively to Defendants BBGI US, Inc., Brunello Cucinelli S.p.A., Brunello Cucinelli, USA, Inc., Bulgari S.p.A., Bulgari Corporation of America, Burberry Group plc, Burberry Limited, Chanel Ltd, Chanel, Inc., Dolce & Gabbana S.r.l., Dolce & Gabbana USA Inc., Ferrari S.p.A., Gianni Versace S.r.l., Versace USA, Inc., Giorgio Armani S.p.A., Giorgio Armani Corporation, Michael Kors (USA), Inc., Prada S.p.A., Prada USA Corporation, Ralph Lauren Corporation, Tapestry, Inc., Tiffany & Co., and Tory Burch LLC.

170.  "**Competing Eyewear Entities**" refers collectively to Defendants Kering S.A., Kering Eyewear S.p.A., Kering Eyewear USA, Inc., LVMH Moët Hennessy Louis Vuitton SE, LVMH Moët Hennessy Louis Vuitton Inc., Christian Dior SE, Christian Dior, Inc., Marcolin S.p.A., Marcolin U.S.A. Eyewear Corp., Thélios S.p.A., and Thelios USA Inc.

171.  "**Proprietary Brands**" refers collectively to the eyewear brands of Defendant Oakley, Inc., Defendant Costa Del Mar, Inc., Alain Mikli, Arnette, Oliver Peoples, Persol, Ray-Ban, Sferoflex, Starck Biotech Paris, and Vogue Eyewear.

172.  "**Licensed Brands**" refers collectively to the eyewear brands of the Fashion Houses for which EssilorLuxottica has an exclusive licensing agreement, which include but are not limited to Armani Exchange, Brooks Brothers, Brunello Cucinelli, Bulgari, Burberry, Chanel, Chaps, Coach, DbyD, Dolce & Gabbana, Emporio Armani, Ferrari, Giorgio Armani, Michael Kors, Miu Miu, Native, Polo Ralph Lauren, Prada, Ralph Lauren, Swarovksi, Tiffany & Co., Tory Burch, and Versace.

173.  "**Retail Outlets**" refers collectively to LensCrafters, Pearle Vision, Target Optical, Sunglass Hut, Oakley retail stores, Ray-Ban retail stores, Glasses.com, FramesDirect.com, and For Eyes.

174.   "**Third Party Sellers**" refers collectively to all ophthalmic distributors or third-party retail channels authorized to sell EssilorLuxottica owned or licensed eyewear.

175.   "**Independent Providers**" refers collectively to the group of EyeMed's in-network eyecare providers not owned directly by EssilorLuxottica.

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

*Fathmath v. EssilorLuxottica S.A., et al.,* United States District Court Northern District of California

Date: July 21, 2023

Respectfully submitted,

*s/ Michael Merriman*
Michael Merriman
HILGERS GRABEN PLLC
655 West Broadway, Suite 900
San Diego, CA 92101
Telephone:  619.369.6232
Email:  mmerriman@hilgersgraben.com

Alec Schultz, *pro hac vice pending*
HILGERS GRABEN PLLC
1221 Brickell Avenue, Suite 900
Miami, FL 33131
Telephone: 305.630.8304
Email:  aschultz@hilgersgraben.com

Hadyn Pettersen, *pro hac vice pending*
HILGERS GRABEN PLLC
1320 Lincoln Mall, Suite 200
Lincoln, NE 68508
Telephone:  402.356.5574
Email:  hpettersen@hilgersgraben.com

*Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL
*Fathmath v. EssilorLuxottica S.A., et al.*, United States District Court Northern District of California